UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD P. GAMBINO, as Administrator,
Electrical Workers' Health and Welfare
Fund, Local 103, I.B.E.W., Electrical
Workers' Pension Fund, Local 103, I.B.E.W.,
Electrical Workers' Supplementary Health
and Welfare Fund, Local 103, I.B.E.W.,
Electrical Workers' Deferred Income Fund,
Local 103, I.B.E.W., Electrical Workers'
Joint Apprentice and Training Fund, Local 103,
I.B.E.W., Electrical Workers' Educational
and Cultural Fund, LAWRENCE J. BRADLEY, as
Executive Secretary-Treasurer, National
Electrical Benefit Fund,
      Plaintiffs,

      v.                       CIVIL ACTION NO.
                               09-10118-NMG

ROTMAN ELECTRICAL CO., INC.,
MICHAEL ROTMAN, Individually, and
NANCY ROTMAN, Individually,
      Defendants,

G. GREENE CONSTRUCTION CO., INC., HARVARD
COOPERATIVE SOCIETY, RICHTER & RATNER
CONTRACTING CORP. and FRANK BEAN,
      Reach and Apply Defendants, and

CITIZENS BANK, MORGAN STANLEY SMITH
BARNEY, CITISMITHBARNEY,
      Trustee Process Defendants.

**REPORT AND RECOMMENDATION RE:**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 99);**
**DEFENDANTS MICHAEL AND NANCY ROTMAN'S CROSS-MOTION FOR**
**SUMMARY JUDGMENT (DOCKET ENTRY # 105); DEFENDANT ROTMAN**
**ELECTRICAL COMPANY, INC.'S CROSS-MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**
**(DOCKET ENTRY # 108)**

**March 16, 2012**

**BOWLER, U.S.M.J.**

Pending before this court are the following motions: (1) a

motion for summary judgment (Docket Entry # 99) filed by

plaintiff Richard P. Gambino ("Gambino" or "the Administrator")
in his capacity as Administrator for the Electrical Workers'
Health and Welfare Fund, Local 103, I.B.E.W, and a number of
other funds ("the Funds");[1] (2) a cross motion for summary
judgment (Docket Entry # 105) filed by defendants Michael and
Nancy Rotman ("the Rotmans"); and (3) a cross motion for partial
summary judgment filed by defendant Rotman Electrical Co., Inc.
("Rotman Electrical") (Docket Entry # 108).  After conducting a
hearing, this court took the motions (Docket Entry ## 99, 105 &
108) under advisement.

## PROCEDURAL BACKGROUND

The crux of the present contract dispute arises out of the
parties' interpretation of a March 11, 2008 security agreement
("the security agreement") signed by the Rotmans and Rotman
Electrical as applied to a March 7, 2008 promissory note ("the
note") also signed by the Rotmans and Rotman Electrical.  Among
the Funds' complaints are Rotman Electrical's failure to pay
unpaid contributions, interest, liquidated damages, attorneys'
fees and costs pursuant to the 1988 Local 103, I.B.E.W. union

---

[1]  The Funds consist of the Electrical Workers' Health and
Welfare Fund, Local 103, I.B.E.W., the Electrical Workers'
Pension Fund, Local 103, I.B.E.W., the Electrical Workers'
Supplementary Health and Welfare Fund, Local 103, I.B.E.W., the
Electrical Workers' Deferred Income Fund, Local 103, I.B.E.W.,
the Electrical Workers' Joint Apprentice and Training Fund, Local
103, I.B.E.W., and the Electrical Workers' Educational and
Cultural Fund.

contract ("the collective bargaining agreement" or "the agreement")[2] and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3) ("section 1132(a)(3)") and 29 U.S.C. § 1145 ("section 1145"), as well as the Rotmans' failure to pay unpaid contributions, interest and attorneys' fees and costs purportedly owed under the security agreement and the promissory note.

On January 26, 2009, Gambino, as Administrator of the Funds, and plaintiff Lawrence J. Bradley, as Executive Secretary-Treasurer of the National Electrical Benefit Fund, (collectively "plaintiffs") filed the original complaint against Rotman Electrical and the Rotmans. (Docket Entry # 1). On April 23, 2010, plaintiffs filed a motion for a preliminary injunction. (Docket Entry # 79). After a hearing on the motion, the court allowed the injunction and ordered Rotman Electrical and the Rotmans ("defendants") to deliver $146,493.00 to an escrow agent. (Docket Entry ## 79 & 92). The Rotmans acknowledge that the amount equals the money the Rotmans withdrew from two investment accounts pledged to secure payment of the note. (Docket Entry # 76). Thereafter, the court appointed an escrow agent and $146,493.33 was placed in escrow with the escrow agent. (Docket Entry # 98).

---

[2] The copies of the agreement plaintiffs filed do not include the entire portion of section 7.1 and do not include section 8.1. (Docket Entry ## 1-4 & 93-2).

Subsequently, on June 15, 2010, plaintiffs filed a verified amended complaint. (Docket Entry # 93). The verified amended complaint sets out the following counts: (1) a violation of section 1145 in connection with unpaid contributions, interest and damages against Rotman Electrical (Count One); (2) a violation of the collective bargaining agreement with respect to contributions, interest and damages against Rotman Electrical (Count Two);[3] and (3) violations of the security agreement and the promissory note against the Rotmans (Count Three).

On July 14, 2011, the Funds filed the summary judgment motion requesting entry of a judgment for $583,201.81 in unpaid contributions, interest, liquidated damages, attorneys' fees and costs. (Docket Entry # 99). The Funds further requested that the Rotmans be held liable for $99,661.52 of Rotman Electrical's debts satisfied, if necessary, by taking collateral pledged under the security agreement. (Docket Entry # 99).

---

[3] Count Two does not refer to section 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185 ("section 185" or "LMRA"). The first paragraph of the amended complaint however includes this reference and Count Two incorporates previous paragraphs in the amended complaint. Plaintiffs' summary judgment motion also addresses the section 185(a) claim for breach of the collective bargaining agreement. See Massachusetts State Carpenters Pension Fund v. Atlantic Diving Co., Inc., 635 F.Supp. 9, 10-11 (D.Mass. 1984) (in addition to ERISA suit, "because Atlantic allegedly breached a collective bargaining agreement, the action to collect delinquent fund payments is also authorized under section 301 of the LMRA, 29 U.S.C. § 185"). "If funds are in fact owing, the Fund is entitled to bring an action under both statutes." Id.

On August 12, 2011, the Rotmans filed the cross motion for summary judgment asserting that their personal liabilities were satisfied by payment in full. (Docket Entry # 105). On the same day, Rotman Electrical filed the partial cross motion for summary judgment asserting that it owed the Funds a lesser amount. (Docket Entry # 108).

STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" <u>Davila v. Corporacion De Puerto Rico Para La Difusion Publica</u>, 498 F.3d 9, 12 (1st Cir. 2007). It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." <u>American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers</u>, 536 F.3d 68, 75 (1st Cir. 2008). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." <u>Id.</u>

Facts are viewed in favor of the non-movant. <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 23 (1st Cir. 2009). When "the nonmovant has the [underlying] burden of proof and the evidence

5

on one or more of the critical issues in the case is not
significantly probative, summary judgment may be granted."
<u>Davila</u>, 498 F.3d at 12 (internal quotation marks, citation and
ellipses omitted); <u>accord</u> <u>Clifford v. Barnhart</u>, 449 F.3d 276, 280
(1st Cir. 2006) (if moving party makes preliminary showing,
nonmoving party must "produce specific facts, in suitable
evidentiary form, to establish the presence of a trialworthy
issue" with respect to each element on which he "would bear the
burden of proof at trial") (internal quotation marks and
citations omitted).

Plaintiffs submit a LR. 56.1 statement of undisputed facts
to support their summary judgment motion.  Uncontroverted
statements of fact in the LR. 56.1 statement comprise part of the
summary judgment record.  <u>See</u> <u>Cochran v. Quest Software, Inc.</u>,
328 F.3d 1, 12 (1st Cir. 2003) (the plaintiff's failure to
contest date in LR. 56.1 statement of material facts caused date
to be admitted on summary judgment); <u>Stonkus v. City of Brockton</u>
<u>School Department</u>, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR.
56.1 and deeming admitted undisputed material facts that the
plaintiff failed to controvert).  Local Rule 56.1 also requires
oppositions to summary judgment motions to contain a statement of
the material facts "with page references to affidavits,
depositions and other documentation."

Defendants' LR. 56.1 statement in response to plaintiffs'

LR. 56.1 statement as well as defendants' LR. 56.1 statements in support of their summary judgment motions do not contain any references to the record. For example, defendants stated reliance on an affidavit followed by a list of allegedly uncontested facts without citations to the record (Docket Entry # 108) does not comply with LR. 56.1. Accordingly, although this court will consider defendants' affidavits and other supporting documentation in support of their summary judgment motions and in opposition to plaintiffs' summary judgment motion, this court will not consider defendants' LR. 56.1 statements.[4]

The factual background includes facts from the verified amended complaint. <u>See</u> <u>generally</u> <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1262-63 (1st Cir. 1991) (facts within verified complaint considered equivalent to summary judgment affidavit). Each summary judgment motion is reviewed separately and factual disputes are resolved in favor of the nonmoving party. <u>See</u> <u>Saenger Organization, Inc. v. NationWide Insurance Licensing Associates</u>, 119 F.3d 55, 56 (1st Cir. 1997).

## FACTUAL BACKGROUND

Prior to going out of business in January 2009, Rotman

---

[4] Plaintiffs' request to deny defendants' summary judgment motions due to the failure to comply with LR. 56.1 lacks merit. In light of the preference to resolve cases on their merits and the nature of the violation, the sanction to deny the motions is not appropriate. The same reasoning applies to plaintiffs' request to deny defendants' summary judgment motions because of a failure to comply with LR. 7.1(a)(2).

Electrical was a Massachusetts corporation engaged in the business of electrical contracting. (Docket Entry # 93). The Rotmans are husband and wife and were principals of Rotman Electrical throughout the relevant time period. (Docket Entry ## 93 & 101-3).

A. Collective Bargaining Agreement

On May 2, 1988, Rotman Electrical signed a letter of assent to join the Electrical Workers Union, Local 103 of the International Brotherhood of Electrical Workers ("I.B.E.W.") of Greater Boston ("the union") and to allow the union to act as a collective bargaining representative. (Docket Entry # 93-1). Because of the letter of assent and the extensions, Rotman Electrical became bound to the terms and conditions of the collective bargaining agreement including the collective bargaining agreement in effect from September 1, 2006 through August 31, 2011. (Docket Entry ## 93, 93-1 & 93-2). Under the collective bargaining agreement, Rotman Electrical was required to make contributions to the Funds for each hour its union employees worked.[5] (Docket Entry # 93). Contribution amounts

_____

[5] Under the agreement, Rotman Electrical contributed approximately $20 per hour of labor to the Funds. (Docket # 104). Thus, in addition to wages, Rotman Electrical was obligated to provide fringe benefits costing approximately $20 per hour of employee labor payable to the Funds. (Docket Entry # 104, ¶ 4). As discussed later, an employer such as Rotman Electrical could apply and receive "market support" from the Administrator and the union allowing the employer "to forgo substantially all of the fringes otherwise payable by the

8

were calculated pursuant to the agreement and were due to the
Funds no later than the fifteenth of each month. (Docket Entry
## 93 & 93-2).

The agreement also established a method to collect
delinquent contribution payments. Specifically, section 4.9 of
the agreement states that:

> The individual Employer, as defined herein, shall be bound
> by rules and regulations promulgated by the Trustees of the
> Trust Funds as regards collection procedures, including but
> not limited to legal fees and interest charges.

(Docket Entry # 93-2). Under section 6.37(f) of the agreement,
delinquent contributions (contributions received by the Funds
later than the fifteenth day of any month) were assessed a 1.5%
interest fee per month, calculated from the contribution due date
until the Funds received the contributions. (Docket Entry ## 93
& 93-2). With respect to an employer with employees covered
under the Electrical Workers Deferred Income Fund, Local 103,
I.B.E.W. ("the DIF"), in the event an employer's contributions
were "delinquent as of December 1st of a calendar year concerning
contributions due prior to such date," the DIF was entitled to
collect as "liquidated damages" an assessment "equal to the
amount of the outstanding delinquency . . . multiplied by the
percentage used to allocate net investment income to individual

---

employer." (Docket Entry # 107, ¶ 6).

accounts for the year ending on November 30th."[6]  (Docket Entry #
93-3).[7]

## B.  Promissory Note and Security Agreement

In 2005, Rotman Electrical began accumulating interest fees
on late contribution payments.  (Docket Entry # 93).  By late
2007, Rotman Electrical was further behind with respect to such
interest payments and contributions for the hourly payments for
union employees.  (Docket Entry ## 93 & 104).  By late February
2008, Rotman Electrical's arrearages in contributions, interest,
attorneys' fees and costs was approximately $400,000.  (Docket
Entry # 104, ¶ 9; Docket Entry # 93, ¶ 26).

In light of this approximate $400,000 delinquency, on March
7, 2008, Rotman Electrical and the Rotmans, as individuals,
signed the promissory note. (Docket Entry # 93-5).  Counsel for
the union ("counsel") drafted the promissory note.  She also made

_____

[6] Plaintiffs fail to provide a calculation of this amount
relative to the unpaid contributions due and unpaid at the time
they filed suit.  See Huff v. Watson Services, Inc., 2009 WL
382729, 6 (S.D.N.Y. Feb. 13, 2009) (collecting cases that
construe the liquidated damages calculation as on those
contributions that remain outstanding at the time the plaintiff
files suit).  To the extent the statutory definition of
liquidated damages in section 1132(g)(2)(C)(ii) also defines the
calculation for "liquidated damages" under the promissory note,
plaintiffs do not establish the amount and are therefore not
entitled to summary judgment on the amount of liquidated damages
due under the note.

[7] There is insufficient evidence in the record to establish
that this liquidated damages provision in the DIF applies to
employers with employees covered under the other funds.

10

it clear to Michael Rotman, who was in ill health at the time, that if he and his wife did not sign the promissory note, the union would terminate services to Rotman Electrical under the collective bargaining agreement. (Docket Entry # 104).

The first paragraph of the four paragraph promissory note states that Rotman Electrical and the Rotmans, defined as the "Makers," "promise to pay the sum of" $401,724.69 to the Funds in the following installments:

| Date Due: | Amount Due: |
|-----------|-------------|
| 3/6/2008 | $100,000 |
| 4/1/2008 | $50,000 |
| 5/1/2008 | $50,000 |
| 6/1/2008 | $50,000 |
| 7/1/2008 | $50,000 |
| 8/1/2008 | $50,000 |
| 9/1/2008 | $50,000 |
| 10/1/2008 | $1,742.69, plus interest from September 2007 and attorneys['] fees and costs from June 2007[.][8] |

(Docket Entry # 93-5). Consistent with the above October 1, 2008 entry, the first sentence of the next full paragraph states that, "The final installment shall include the full amount of interest from September 2007 and attorneys['] fees and costs accrued in the collection of the amounts due the Funds from June 2007." (Docket Entry # 93-5). This paragraph also refers to "the entire

---

[8] The promissory note did not include monetary figures for the interest from September 2007 and the attorneys' fees and costs from June 2007. (Docket Entry # 93-5).

amount due" and "the entire amount owed."[9]  Given such

unambiguous language, the note requires Rotman Electrical and the

Rotmans to pay the designated amount ($401,724.69) "plus interest

from September 2007 and attorneys['] fees and costs from June

2007." (Docket Entry # 93-5).  This designated amount

constitutes the full amount or the entire amount of the debt in

the note.[10]

The note also refers to "liquidated damages" near the end of

two separate sentences.  One sentence is in the second paragraph

and the other sentence is in the third paragraph.  The sentence

appearing in the second paragraph reads, "If Rotman Electrical

---

[9]  In its entirety, this paragraph reads as follows:

The final installment shall include the full amount of
interest from September 2007 and attorneys['] fees and costs
accrued in the collection of the amounts due the Funds from
June 2007.  Each payment shall be delivered to the Funds on
or before the date it is due.  The Makers may pay *the full
amount due* to the Funds at any time.  This payment plan is
contingent upon Rotman Electrical Co, [sic] Inc. abiding by
its current obligations to make contributions to the Funds.
If Rotman Electrical Co, [sic] Inc. falls behind in its
current obligations to the Funds, the Funds will proceed to
collect *the entire amount owed* to the Funds, including
interest, liquidated damages, attorney's fees and costs of
collection, from the assets listed in Schedules A, B, and C
attached hereto and incorporated by reference herein.

(Docket Entry # 93-5) (emphasis added).

[10]  For clarity, this court at times refers to this debt as
"the original debt."  The Funds argue that the Rotmans obligated
themselves to pay the entire amount of Rotman Electrical's
delinquent contributions and associated charges including those
arising after the March 2008 signing of the promissory note.

Co, [sic] Inc. falls behind in its current obligations to the Funds, the Funds will proceed to collect the entire amount owed to the Funds, including interest, liquidated damages, attorney's fees and costs of collection, from the assets listed in Schedules A, B, and C attached hereto and incorporated by reference herein." (Docket Entry # 93-5). The sentence appearing in the third paragraph reads, "Should payment of $400,000 not be received on or before October 1, 2008 [the due date for the last payment], the Makers each agree that the Funds may take the assets listed in the attached Schedules A, B and C to satisfy the full amount of the remaining debt, with additional interest, liquidated damages, and attorneys['] fees and costs as they accrue." (Docket Entry # 93-5).

Each sentence begins by setting out a condition which, if it occurs, allows the Funds to take "the entire amount owed" or "the full amount of the remaining debt," including interest, "liquidated damages" and attorney's fees and costs. The "liquidated damages" in each sentence refers to part of the damages imposed if the note is breached by the failure to perform the condition at issue.

One condition takes place when Rotman Electrical "falls behind in its current obligations to the Funds."[11] (Docket Entry

---

[11] The relevant language states:

This payment plan is contingent upon Rotman Electrical Co,

# 93-5).  The other condition occurs if the Funds do not receive a total of $400,000 on or before October 1, 2008.[12]  (Docket Entry # 93-5).

As to the collateral, if either condition occurs, the Funds could "collect the entire amount owed" or "the full amount of the remaining debt" from the assets listed in Schedules A, B and C. Schedule B consists of the aforementioned two investment accounts.  In addition, the Funds could take the assets in the three schedules if either condition took place to satisfy the original debt and to satisfy or collect "additional interest, liquidated damages," attorneys' fees and costs of collection or costs as they accrue.

---

[sic] Inc. abiding by its current obligations to make
contributions to the Funds.  If Rotman Electrical Co, [sic]
Inc. falls behind in its current obligations to the Funds,
the Funds will proceed to collect the entire amount owed to
the Funds, including interest, liquidated damages,
attorney's fees and costs of collection, from the assets
listed in Schedules A, B, and C attached hereto and
incorporated by reference herein.

(Docket Entry # 93-5).

[12]  As previously stated, this language reads:

Should payment of $400,000 not be received on or before
October 1, 2008 [the due date for the last payment], the
Makers each agree that the Funds may take the assets listed
in the attached Schedules A, B and C to satisfy the full
amount of the remaining debt, with additional interest,
liquidated damages, and attorneys['] fees and costs as they
accrue.

(Docket Entry # 93-5).

It is undisputed that the Rotmans had not paid the Funds
$400,000 (or more) by October 1, 2008.[13]  It is also undisputed,
as discussed below, that Rotman Electrical subsequently fell
behind in its obligations to pay contributions to the Funds.
Accordingly, the Funds had the ability to "take the assets" in
Schedules A, B and C to satisfy the deficiency.

On or about March 11, 2008, Rotman Electrical and the
Rotmans, as individuals, signed the security agreement.  The
security agreement granted the Funds "a security interest in and
to the" property in the three schedules defined as "THE
'COLLATERAL.'"[14]  (Docket Entry # 93-4).  The paragraph captioned

_____

[13]  The difference between what Rotman Electrical and the
Rotmans promised to pay and what they did pay is as follows:

| Date Due: | Amount Due: | Date Paid: | Amount Paid: |
|-----------|-------------|------------|--------------|
| 3/6/2008 | $100,000 | 3/19/2008 | $100,000 |
| 4/1/2008 | $50,000 | 4/17/2008 | $50,000 |
| 5/1/2008 | $50,000 | 6/2/2008 | $50,000 |
| 6/1/2008 | $50,000 | 7/28/2008 | $25,000 |
| 7/1/2008 | $50,000 | 8/18/2008 | $75,000 |
| 8/1/2008 | $50,000 | 9/29/2008 | $50,000 |
| 9/1/2008 | $50,000 | 11/24/2008 | $25,000 |
| 10/1/2008 | $1,742.69 plus interest from September 2007 and attorneys['] fees and costs from June 2007 | | 0.00 |

(Docket Entry # 101, ¶ 17).  These payments yield a remaining
principal balance of $26,742.69.

[14]  The specific language granting the security interest
reads as follows:

    Rotman Electrical . . . Michael Rotman, individually, and
    Nancy Rotman, individually, . . . hereby grant to the
    [Funds] . . . a security interest in and to the following

15

"THE OBLIGATIONS" states that the security interest in the property in the three schedules (and any and all substitutions and additions):

> is to secure the payment of principal and interest as provided in a promissory note . . . in the amount of $401,724.69, with interest from September 2007 to present, attorneys['] fees and costs, and any and all indebtedness, liabilities and obligations of Debtors to Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, secured or unsecured, now existing or hereafter arising.[15]

(Docket Entry # 93-4).  Thus, in addition to securing the original debt in the promissory note,[16] the security agreement provides that the collateral secured "all indebtedness, liabilities and *obligations of Debtors* to Secured Parties," i.e.,

---

> property and any and all substitutions thereof and replacements thereof and any and all additional and accessions thereto, hereinafter, as appropriately designated, called the "Collateral":
>
> **FIRST:**  <u>THE COLLATERAL</u>
>
> The collateral includes the list of vehicles and equipment attached hereto as Schedule A, the list of investment accounts attached hereto as Schedule B, and the list of accounts receivable attached hereto as Schedule C.

(Docket Entry # 93-4).

[15]  The Funds rely on this language as exemplifying the Rotmans' obligation to pay the entire amount of Rotman Electrical's delinquent contributions and associated charges.

[16]  The promissory note also extends to "attorneys['] fees and costs from June 2007."  (Docket Entry # 93-5).

the Funds.[17]  (Docket Entry # 93-4) (emphasis added).  The same

paragraph also states that the deposits the Funds credited "to

Debtors" shall constitute security for the obligations and the

Funds "may apply or setoff such deposits or other sums against

Debtors' obligations at any time whether or not said obligations

are then due."  (Docket Entry # 93-4).  The Rotmans, on behalf of

themselves and Rotman Electrical, did not obtain counsel to

review the promissory note or the security agreement.  (Docket

Entry # 104).

    The collateral pledged consisted of the assets in the three

schedules.  Rotman Electrical and the Rotmans individually

pledged the three sources of collateral identified as Schedules

A, B and C and all substitutions, replacements and additions.

The security agreement allowed the Funds to take possession of

the collateral "upon the occurrence of any event of default."

(Docket Entry # 93-4).  An event of default included a default by

"Debtors in payment or performance of any obligation, covenant or

agreement between the parties or in any note secured hereby or

thereby."[18]  The three schedules consisted of a number of

_____

    [17] Defendants argue that "obligations of Debtors" refers to
the obligations of all three (Rotman Electrical, Michael Rotman
and Nancy Rotman) as opposed to the obligations of just Rotman
Electrical alone.

    [18] As previously explained, the promissory note allowed the
Funds to take the assets in the three schedules if one or both of
the aforementioned two conditions occurred.  The above event of
default encompasses a failure to perform under the promissory

individual and company vehicles and equipment (Schedule A); the
two individual investment accounts from which the Rotmans
acknowledge withdrawing $146,493.00, the amount the court ordered
placed in escrow (Schedule B); and a list of Rotman Electrical's
accounts receivable (Schedule C).[19]  (Docket Entry # 93-4).  The
Schedule B investment accounts were a Morningstar Managed
Portfolio account[20] and a CitiSmithBarney account.[21]  (Docket
Entry # 93-4).  The Rotmans thus represented that the two
accounts totaled $204,315.66 at the time the parties entered into
the security agreement, according to Gambino.[22]  (Docket Entry ##
93-4 & 101-1).

Although Rotman Electrical made installment payments on the
note each month from March to September 2008, the payments were
consistently late.[23]  (Docket Entry # 93, ¶ 27, first sentence).

---

note which, in turn, takes place when one or both of the two
conditions occur.

[19]  The parties focus on the ability of the Funds to satisfy
Rotman Electrical's debt with the CitiSmithBarney account in
Schedule B.  The Funds allege and the Rotmans do not dispute that
the Internal Revenue Service ("IRS") took the corporate assets.

[20]  The Associate General Counsel of Morningstar, Inc. states
that the account, which the Rotmans owned, was closed and all
monies withdrawn on or about March 9, 2010.  (Docket Entry # 81-
1).

[21]  A March 10, 2010 CitiSmithBarney statement for the
account shows a balance of $42,914.18.  (Docket Entry # 76-1).

[22]  (Docket Entry # 92).

[23]  See footnote 13.

As reflected by the dates of payments in footnote 13, Rotman Electrical became increasingly delinquent from March 6 until October 1, 2008, when it failed to pay the $25,000 due on September 1, 2008, and the remaining $1,742.69 plus interest from September 2007 and the attorneys' fees and costs from June 2007. (Docket Entry # 101, ¶ 17). Separate and apart from the delinquencies in these installment payments, Rotman Electrical failed to pay current contributions for one half of the amount owed in July 2008 and failed to pay any contributions between August 2008 and December 2008. (Docket Entry # 93, ¶ 28). The unpaid balance of the promissory note totaled $26,742.69 as of October 2008. The unpaid contributions for the months of August to December 2008 totaled $375,359.22 as of December 2008.[24] (Docket Entry # 93, ¶¶ 27-28).

On January 13, 2009, the Funds requested that the Rotmans sign a second promissory note ("the second note" or "the new promissory note") and a new security agreement ("the new security agreement") to guarantee Rotman Electrical's unpaid principal contributions in the amount of $375,000, i.e., an amount similar

---

[24] Rotman Electrical disputes $168,957.63 of this amount as well as $76,030.93 in interest the Funds currently claim is due. (Docket Entry # 106; Docket Entry # 107, ¶¶ 12 & 14). Rotman Electrical therefore cross moves for partial summary judgment in the amount of $244,988.56 ($168,957.63 + $76,030.93), believing this amount was subject to exclusion under a May 16, 2008 market support agreement between the Funds and Rotman Electrical. (Docket Entry ## 106 & 107).

to the aforementioned amount of Rotman Electrical's delinquent contributions that arose after the March 2008 signing of the promissory note. (Docket Entry # 104). According to Michael Rotman, Gambino and the Funds' counsel pressed him and his wife to sign the new promissory note and new security agreement by indicating the union would terminate services to Rotman Electrical in the event the Rotmans did not sign the agreements. Like the March 2008 promissory note, the new promissory note would require the Rotmans to make seven monthly installment payments beginning on January 15, 2009, of $50,000 each and an eighth installment payment of $25,000 on August 15, 2009, "plus accrued interest from date due until date paid and attorneys' fees and costs." (Docket Entry # 104, Ex. B). Notably, under the new promissory note the Rotmans would agree to pledge as collateral the same assets they pledged in the March 2008 promissory note except for certain differences in the accounts receivables listed in Schedule C.[25] (Docket Entry # 93-5; Docket Entry # 104, Ex. B). After consulting with their counsel, the

---

[25] In the event of an ambiguity in the promissory note and/or the security agreement, defendants rely on this course of conduct as evidencing the intent of the parties that the March 2008 promissory note and security agreements did not extend to secure Rotman Electrical's delinquent contributions occurring after the March 2008 promissory note. Defendants likewise use this course of conduct to show that the parties did not intend the collateral in Schedules A, B and C to cover Rotman Electrical's delinquent contributions occurring after the March 2008 promissory note.

Rotmans refused to sign the second note and the new security agreement. (Docket Entry # 104, ¶ 23).

In late January 2009, union members walked off Rotman Electrical job sites. (Docket Entry # 104, ¶ 26). Rotman Electrical permanently ended business operations at the end of January 2009. (Docket Entry # 104). During the month of January, Rotman Electrical did not provide the Funds with a monthly report of employee hours. Estimating the hours based on previous monthly reports, the Funds calculate the amount of unpaid contributions as $68,247.13.[26] (Docket Entry # 101-1).

C.  Market Support

In the spring of 2008, as Rotman Electrical struggled to keep afloat as a corporation, it requested market support from the Administrator and the union before bidding on a project known as the Westinghouse job. (Docket Entry # 107). During this time period, the Administrator and the union offered employers such as Rotman Electrical a market support which allowed contractors to forgo substantially all of the fringe benefit contributions otherwise payable by the employer to the Funds.[27] (Docket Entry # 107). Because fringe benefit contribution payments to the

_____

[26]  January's unpaid benefit contributions were calculated from January 1 to January 26, 2009. (Docket Entry # 101-1). The Funds calculated these unpaid contributions by averaging Rotman Electrical's monthly benefit contributions for the five and one half months prior to January 2009. (Docket Entry # 101-1).

[27]  See footnote three.

21

Funds totaled approximately $20 an hour, such support allowed union contractors to remain competitive in bidding for and securing contracts. (Docket Entry # 107).

Market support was made available through the Electrical Industry Labor Management Cooperation Trust ("EILMCT"). (Docket Entry # 112-1). Under the union's procedures and instructions for market support, an employer "must" complete, sign and submit a request form "to the Trustees." (Docket Entry # 107, p. 37; Docket Entry # 112-1). The Trustees then determine an amount of assistance, if any, and transmit the decision to the union office and the employer seeking assistance. (Docket Entry # 107, p. 37). The procedures also state that, "No contractor shall be eligible for relief unless that employer is current on all obligations to the Trust Funds."[28] (Docket Entry # 107, p. 37; Docket Entry # 112-1). In the event the employer secures a job under the market support program, an escrow account is created for the approved amount. The procedures also "require a separate Monthly Payroll Report for all employees working on the assisted project." (Docket Entry # 107, p. 37; Docket Entry # 112-1).

The summary judgment record does not include a form completed by Rotman Electrical requesting market support for the

---

[28]  At the time Rotman Electrical bid for the Westinghouse job, the Administrator and the union knew that Rotman Electrical was struggling financially. As discussed infra, it is a genuine issue of material fact as to whether the referenced "Trustees" or the Funds waived this requirement.

Westinghouse job.  There is also no evidence of an escrow fund.
Gambino attests that EILMCT "does not waive benefit
contributions."  Michael Rotman, however, attests that the
company sought market support for the Westinghouse job and that
Michael P. Monahan ("Monahan"), Business Manager, Local 103
I.B.E.W., sent him an email agreeing to provide such support.  In
particular, on May 16, 2008, Michael Rotman received an email
from Monahan approving assistance for the Westinghouse job.[29]
(Docket Entry # 107).  The email reads:

> Mike,
>
> This email is to confirm that the Fund has approved your
> request for assistance on the Westinghouse Lofts job.
>
> Regards,
> Michael P. Monahan
> Business Manager

(Docket Entry # 107, p. 8).  In May 2008, during the promissory
note repayment period, Rotman Electrical bid on and won the
Westinghouse job.  (Docket Entry # 107).

Rotman Electrical submitted monthly reports from June
through December of 2008.  The reports indicated the amounts of
contributions "that would have been earned by each employee"
without market support as well as the net amounts due after the

---

[29]  Gambino attests that, "On May 16, 2008, Rotman Electrical
was not current in its payment obligations to the Funds, though
it had entered into a payment plan and provided security for
Rotman Electrical's current and ongoing obligations to the
Funds."  (Docket Entry # 112-1).

application of market support. (Docket Entry # 107). "At no time" between June and "December 2008 did the Administrator," Monahan "or any other representative of IBEW Local 103" suggest to Michael Rotman that the monthly "reports were not valid or binding" or that "[m]arket [s]upport had terminated." (Docket Entry # 107). In accord with its understanding, Rotman Electrical did not pay $168,957.63 in contributions to the Funds for the Westinghouse job. (Docket Entry # 107).

In light of the above, it is a genuine issue of material fact as to whether Rotman Electrical received approval for market support for the Westinghouse job even though it was known at the time the company was struggling financially and was not current in its obligations to the Funds. Stated differently, it is a genuine issue of material fact whether Monahan awarded Rotman Electrical market support for the Westinghouse job. The Funds, however, included the amounts of the contributions (and 1.5 percent interest fees) that purportedly were the subject of market support in calculating the amounts now due from Rotman Electrical.[30]

D.  Third-Party Payments

In an attempt to collect Rotman Electrical's unpaid

_____

[30]  Michael Rotman attests that the sum charged to Rotman Electrical for the unpaid market support is $168,957.63. With interest through July 11, 2011, the amount totals $244,988.56, according to Michael Rotman. (Docket Entry # 107).

24

contributions and accruing interest, the Funds' counsel sent letters to Rotman Electrical in August, September, October and December 2008 requesting payment on the delinquent amounts. (Docket Entry # 93). Rotman Electrical was unable to tender sufficient payment and the Funds filed this action on January 26, 2009. (Docket Entry # 1).

After filing the original verified complaint on January 26, 2009, the Funds filed a number of mechanic's liens under Massachusetts General Laws chapter 254 ("chapter 254"), sections one and four. As a result, the Funds recovered $231,312 from property owners with direct liability to the Funds for contributions owed on Rotman Electrical job sites.[31] (Docket Entry ## 93 & 112). The Funds applied the lien payments to the accounts of Fund participants who worked on Rotman Electrical job sites during the 90 day period prior to Rotman Electrical's closure. The Funds did not apply any portion to the outstanding principal owed on the promissory note.[32] (Docket Entry ## 112 &

---

[31] The mechanic's lien collections consisted of 16 mechanic's liens filed on job sites where participants had worked within the 90 day period prior to Rotman Electrical ceasing business operations. (Docket Entry # 112).

[32] As previously noted, the remaining principal owed under the promissory note was $26,742.69. The Funds point out that Rotman Electrical designated its last payments of $25,000 on July 28, 2008; $75,000 on August 18, 2008; $50,000 on September 29, 2008; and $25,000 on November 24, 2008, as payments on the promissory note rather than delinquent contributions. The Rotmans thus reduced their personal liability on the promissory note in lieu of reducing the company's obligations.

112-1).  If a payment was less than the amount of a full contribution, the Funds applied the payment pro rata.  (Docket Entry ## 112 & 112-1).

On January 11, 2009, Rotman Electrical entered into a settlement agreement with the Funds and a number of corporate entities connected with two Rotman Electrical jobs (the Albany project and the Westinghouse project).  Under the settlement agreement, Rotman Electrical agreed that Albany Associates LLC and Westinghouse[33] would directly pay the Funds $110,044.10.[34] (Docket Entry # 107).  The amount tendered in the settlement agreement was part of the $231,312 collected through mechanic's liens and included over $103,000 in satisfaction of section one and four liens under chapter 254 involving the Westinghouse job. (Docket Entry # 107).  Prior to the agreement, property owners at the job sites rejected Rotman Electrical's proposal to reserve the issue of allocation. (Docket Entry # 112-1).  The settlement amount went to the Funds which made the allocations according to the property owners.  (Docket Entry # 112-1).  As set forth in the settlement agreement, Rotman Electrical agreed to a back

[33]  The settlement agreement does not define Westinghouse.

[34]  The IRS was also a party to the settlement agreement.  As part of the settlement, the IRS received $25,000 and applied it to unpaid taxes owed by Rotman Electrical.

charge of $110,044.10.[35]  (Docket Entry # 107).

E.  <u>Rotman Electrical and the Rotmans' Outstanding Debt</u>

The Funds calculate Rotman Electrical's outstanding debt as $583,201.81 as of July 2011.  (Docket Entry ## 93, 99 & 101). They arrive at this figure by adding (1) the unpaid contributions between August 2007 and July 2008 ($21,407.61); (2) the unpaid balance of the promissory note or unpaid contributions for November 2007, December 2007 and January 2008 ($26,742.69);[36] (3) the unpaid contributions from July 2008 to December 2008 ($375,359.22);[37] (4) the estimated unpaid contributions for January 2009 ($68,247.13); (5) unpaid interest on late paid contributions between October 2005 and January 2009 ($105,055.10); and (6) unpaid interest on unpaid contributions if paid by July 11, 2011 ($66,121.25).  (Docket Entry ## 93, 101 & 101-1).  The Funds then subtract the $231,312 received pursuant to mechanic's liens (Docket Entry # 101) and add attorneys' fees and costs ($85,459.56) as well as liquidated damages ($66,121.25)

_____

[35]  The settlement agreement states that the settlement payments ($110,044.10) "shall be back charged by Albany and Mother Brook against Hamilton, which in turn shall back charge Rotman [Electrical].  Rotman [Electrical] agrees to the back charge of the settlement payments."  (Docket Entry # 107, p. 21).

[36]  See footnote 45 and related text.

[37]  This total includes $168,957.63 of unpaid contributions which Rotman Electrical contests as market support assistance for the Westinghouse job that should not have been charged.  (Docket Entry # 93).

27

(Docket Entry ## 100 & 101-4).

As opposed to $583,201.81, Rotman Electrical claims it only owes $310,782.59 because of the improper inclusion of market support ($168,957.63), the improper inclusion of market support interest ($76,030.93) and the improper interest calculation for the October 2007 to March 2008 time period which should not exceed $25,000, i.e., not the $52,430.66 amount the Funds identified.[38]  (Docket Entry # 106).

The Funds calculate the Rotmans' personal liability under the promissory note and the security agreement as $99,661.52. (Docket Entry # 99).  They arrive at this figure by adding:  (1) the unpaid balance of the promissory note ($26,742.69); (2) the unpaid interest on late paid contributions from September 2007 through January 2008 ($52,430.66); and (3) attorneys' fees and costs ($20,488.17).  The $20,488.17 amount consists of all legal fees and costs from June 2007 to January 25, 2009 ($9,205.58) and half of the legal fees and costs incurred from January 26, 2009

---

[38]  Rotman Electrical limits its cross motion for partial summary judgment to seeking a reduction of amounts owed by the first two figures ($244,988.56).  (Docket Entry # 108).  It opposes the Funds' summary judgment motion insofar as the Funds seek the full amount of $583,201.81 but it does not contest that it owes $310,782.59 of that amount.  (Docket Entry ## 106 & 109). The opposition therefore includes the objection to the additional interest in the amount of $27,430.66 ($52,430.66 – $25,000 = $27,430.66).  The Funds do not explicitly refer to this amount ($52,430.66) as charged against Rotman Electrical.  This court assumes the Funds included the amount in the $105,055.10 charge against Rotman Electrical in item five above because it covers the same subject matter albeit spanning a longer time period.

to July 14, 2011, excluding any work pursuing the mechanic's liens ($11,282.59 or $22,565.19 ÷ 2.0).  (Docket Entry ## 100, 101-1 & 101-4); Docket Entry # 101, ¶ 23).

The Rotmans dispute $27,430.66 of the $99,661.52 claimed balance.  This dispute centers around the Funds' calculation of the unpaid interest ($52,430.35).  Michael Rotman attests to calculating the sum as approximately $25,000.[39]  Crediting back the market support for the Westinghouse job and the application of the $110,044.10 proceeds from the mechanic's liens on the Westinghouse and Albany projects, the Rotmans submit that the amount owed on the promissory note is zero.

## DISCUSSION

Plaintiffs seek summary judgment against Rotman Electrical in the amount of $583,201.81 in unpaid contributions, interest, liquidated damages, attorneys' fees and costs under 29 U.S.C. §§ 1132(a)(3) and 1145. (Docket Entry # 99).  Plaintiffs also seek summary judgment against the Rotmans in the amount of $99,661.52 in unpaid principal, interest on late paid contributions due from September 2007 through January 2008, attorneys' fees and costs owed under the promissory note and the security agreement. Further, they seek an order allowing them to collect the

---

[39]  In light of the calculations by Gambino, the amount of unpaid interest above $25,000 constitutes a genuine issue of material fact.

29

foregoing amounts owed by Rotman Electrical and the Rotmans[40] from the monies deposited in escrow ($146,493.33) (Docket Entry # 98) under the court's May 21, 2010 Order (Docket Entry # 92) and the remaining amount[s] in the two investment accounts in Schedule B.

The Rotmans dispute the ability of the Funds to satisfy the corporate debts of Rotman Electrical incurred after the March 2008 note and security agreement to pay Rotman Electrical's July 2008 through January 2009 unpaid contributions and interest on such unpaid contributions. They maintain that the note and the security agreement only cover the obligations of all three debtors. Their cross motion for summary judgment therefore seeks an order declaring that "The Rotmans' Collateral secures only those obligations that they incurred under the Promissory Note, and no others." (Docket Entry # 105).

The Rotmans also submit that $110,044.10 of the $231,321 settlement recovery by the Administrator represents proceeds from the Westinghouse project in connection with the mechanic's liens filed by the Administrator.[41] Even through Rotman Electrical agreed to the $110,044.10 charge back in the settlement

---

[40] The Rotmans maintain that the Funds cannot use the assets in Schedule B to satisfy the corporate debts of Rotman Electrical incurred from July 2008 to January 2009 in unpaid contributions and interest because the note and the security agreement do not extend to cover these obligations.

[41] See footnote 35 and related text.

agreement, the Rotmans maintain that the Administrator must use the recovery to satisfy the oldest of Rotman Electrical's debts, i.e., the remaining balance owed under the promissory note. The Rotmans submit this would extinguish their liability, if any, for the $99,661.52 owed under the note. Specifically, because the Administrator only seeks $99,661.52 from the Rotmans consisting of the principal balance on the note ($26,742.69), interest due on the late paid contributions under the note ($52,430.66) and attorney's fees and costs under the note ($20,488.17), the Rotmans' cross summary judgment motion seeks a second declaration that "[t]he obligations of the Promissory Note have been legally satisfied by application of cash proceeds received by the Administrator since the commencement of this civil action." (Docket Entry # 105). The Rotmans' additionally argue that the Administrator cannot use the $187,000 "amount of the Rotmans' personal savings held as collateral" (Docket Entry # 109)[42] to satisfy any debt other than the obligations of the debtors under the promissory note.

Rotman Electrical only partially opposes plaintiff's summary judgment motion. Rotman Electrical agrees that it owes the Funds

---

[42] The Rotmans' papers do not explain the origin of the "$187,000 more or less" figure. This court assumes it is the escrow amount ($146,493) plus interest but minus the initial fee charged by the escrow agent, which the court ordered payable from the escrow account (Docket Entry # 97), together with the balance in the CitiSmithBarney account ($42,914.18 as of March 10, 2010) pledged in Schedule B.

$310,782.59 of the $583,201.81 amount and contests an additional $27,782.59 of the alleged $583,201.81 debt. (Docket Entry # 109). In moving for partial summary judgment, Rotman Electrical seeks to reduce the $583,201.81 figure by the amount of market support ($168,957.63) and the related interest ($76,030.93) which the Administrator charged to Rotman Electrical for the Westinghouse job.[43] (Docket Entry # 168).

## A.  Rotman Electrical's Liability

Counts one and two respectively set out violations of section 1145 for delinquent contributions and section 185 for breach of the collective bargaining agreement against Rotman Electrical based on unpaid contributions, interest, liquidated damages, attorneys' fees and costs. Initially, this court turns to this liability.

The record establishes that the Funds are employee benefit plans within the meaning of ERISA, see 29 U.S.C. § 1002(1)-(3); (Docket Entry # 93-2); Docket Entry # 112, ¶ 2; Docket Entry # 101-1, ¶ 1), as well as multiemployer plans within the meaning of ERISA. See 29 U.S.C. § 1002(37)(A). As a signatory to the letter of assent, Rotman Electrical is an employer within the meaning of ERISA, see 29 U.S.C. § 1002(5), and agreed to be bound by the terms and conditions of the collective bargaining agreement.

---

[43]  See footnote 24 and related text.

The collective bargaining agreement requires signatories
such as Rotman Electrical to make contributions for every hour
worked by an employee and participant of the Funds.  "It is
well-established that the failure to make contributions to a
union trust fund as required by a collective bargaining agreement
constitutes a violation of ERISA § 515 and a violation of [29
U.S.C. § 185]."  Hudson County Carpenters Union Local Union No.
6. v. V.S.R. Constr. Corp., 127 F.Supp.2d 565, 568 (D.N.J. 2000).
In no uncertain terms, section 1145 "requires every employer who
is obligated to make contributions to a multiemployer plan under
the terms of the plan or a collective bargaining agreement to
make such contributions in accordance with the terms of such plan
or agreement."  29 U.S.C. § 1145; Plasterers' and Cement Masons'
Local 40 Pension Fund v. Capital Curbing Corp., 2010 WL 1424722,
*2 (D.R.I. March 12, 2010).

The collective bargaining agreement also imposes a
delinquent fee which the Funds' Trustees have determined is a
1.5% interest charge on delinquent contributions each month.
(Docket Entry # 93, ¶ 24; Docket Entry # 93-2, ¶ 6.37).  An
employer's "[f]ailure to make agreed-upon contributions is a
violation of ERISA, which is actionable under the civil
enforcement provisions of 29 U.S.C. § 1132."  Sheet Metal
Workers' Union Local #441 Health and Welfare Fund v. Ace
Fabrication, Inc., 2012 WL 170194, *3 (S.D.Ala. Jan. 18, 2012);

see <u>Wisconsin UFCW Unions & Employers Health Plan v. Woodman's</u> <u>Food Market, Inc.</u>, 348 F.Supp.2d 1005, 1008 (E.D.Wis. 2004) ("multi-employer plan may 'enforce as written the contribution requirements' found in a collective bargaining agreement"). If successful, the statute requires an award of "unpaid contributions," "interest on unpaid contributions," "an amount equal to the greater of (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan"[44] and reasonable attorneys' fees and costs. 29 U.S.C. § 1132(g)(2).

Gambino, as Administrator of the Funds, and plaintiff Lawrence J. Bradley, as Executive Secretary-Treasurer of the National Electrical Benefit Fund, have standing to sue the employer, Rotman Electrical, for delinquent contributions owed under section 1145. <u>See</u> <u>Rhode Island Carpenters Annuity Fund v.</u> <u>Trevi Icos Corp.</u>, 474 F.Supp.2d 326, 329-330 (D.R.I. 2007); <u>see</u> <u>also</u> <u>Automobile Mechanics Local 701 Welfare and Pension Funds v.</u> <u>Vanguard Car Rental USA, Inc.</u>, 502 F.3d 740, 744-45 (7th Cir. 2007). Under Count One, section 1145 "supplies the substantive right" to plaintiffs seeking to enforce an employer's obligation to make contributions under the terms of a multiemployer plan or collective bargaining agreement. <u>Automobile Mechanics Local 701</u> <u>Welfare and Pension Funds v. Vanguard Car Rental USA, Inc.</u>, 502

---

[44] As described in the factual background, only DIF has a liquidated damages provision.

F.3d at 744. In a section 1145 claim, "'It is the collective bargaining and contribution agreements which establish the employer's obligation to the pension fund.'" Langone v. USCO Distribution Services, Inc., 389 F.Supp.2d at 97 (quoting Central States, Se. & Sw. Areas Pension Fund v. Kroger Co., 73 F.3d 727, 730 (7th Cir. 1996); internal brackets omitted). The collective bargaining agreement likewise controls the claim in Count Two alleging its breach under section 185.

The collective bargaining agreement unambiguously required Rotman Electrical to make contributions to the Funds for actual hours worked by its union employees. (Docket Entry # 93-2, ¶ 6.37). It also required payment by the 15th "of the month following the incurring of the obligation" and imposed the above noted delinquent fee of 1.5% interest.

Gambino, the Administrator of the Funds, attests that Rotman Electrical owes the following amounts in contributions and interest: (1) unpaid contributions between August 2007 and July 2008 ($21,407.61); (2) unpaid contributions owed for November 2007, December 2007 and January 2008 ($26,742.69);[45] (3) unpaid

---

[45] This figure and the amount it represents equate to the unpaid balance on the promissory note. (Docket Entry # 101-1, ¶ 6(B); Docket Entry # 112-1, ¶ 12). Because recovery against Rotman Electrical is under ERISA and breach of the collective bargaining agreement in counts one and two as opposed to breach of the note, the unpaid amount is properly attributed to the unpaid contributions as opposed to the unpaid balance on the promissory note.

contributions from July 2008 to December 2008 ($375,359.22);[46]
(4) estimated unpaid contributions for January 2009 ($68,247.13);
(5) unpaid interest on late paid contributions between October
2005 and January 2009 ($105,055.10);[47] and (6) unpaid interest on
unpaid contributions if paid by July 11, 2011 ($66,121.25).
(Docket Entry ## 93, 101 & 101-1).  Together with damages
calculated in accordance with section 1132(g)(2)(C) ($66,121.25)
and attorneys' fees and costs ($85,459.56) and deducting the
amount received through mechanic's liens ($231,312), plaintiffs
seek $583,201.81 under counts one and two.

The remedies in section 1132(g)(2) "are mandatory in all
actions to collect delinquent contributions."  <u>Malden Mills
Industries, Inc. v. ILGWU Nat. Retirement Fund</u>, 780 F.Supp. 68,
70 (D.Mass. 1991).  Section 1132(g)(2) provides for an award of
"the unpaid contributions" and the "interest on unpaid
contributions," 29 U.S.C. § 1132(g)(2)(A) and (B), as well as
additional damages of "interest on unpaid contributions," 29

_____

[46]  This total includes $168,957.63 of unpaid benefit
contributions which Rotman Electrical contests as market support
assistance for the Westinghouse job that should not have been
charged.  (Docket Entry # 93); See footnote 24.

[47]  By definition, this figure includes the $27,782.59 of
unpaid interest on late paid contributions for the September 2007
through March 2008 time period.  Rotman Electrical objects to its
inclusion but does not seek summary judgment on the amount.

U.S.C. § 1132(g)(2)(C).[48] Section 1132(g)(2) also includes a mandatory remedy of "reasonable attorney's fees and costs."  29 U.S.C. § 1132(g)(2)(D); see <u>Laborers' Dist. Council Pension v. E.G.S., Inc.</u>, 2010 WL 1568595, *4 (D.Md. April 16, 2010) (under section "1132(g)(2)(D), when the Court enters judgment in favor of the plaintiff in an ERISA action for a plan to recover unpaid contributions, it 'shall award the plan reasonable attorney's fees and costs of the action, to be paid by the defendant'") (internal ellipses omitted).  The foregoing amounts for delinquent contributions, interest on unpaid contributions, damages equal to interest on unpaid contributions under section 1132(g)(2)(C)(i), attorney's fees and costs all constitute remedies under section 1132(g)(2) for delinquent contributions under section 1145.  As such, they are properly recoverable from the employer, Rotman Electrical, under Count One.  Likewise, the forgoing amount for unpaid contributions in items one through four and interest at the 1.5% rate on the unpaid contributions in items five and six are all recoverable under the term of the collective bargaining agreement under Count Two.

Notably, Rotman Electrical does not object to any of the foregoing amounts, including the reasonableness of the attorneys'

---

[48]  The alternative calculation for the amount of damages in section 1132(g)(2)(C) does not apply under the circumstances of this case and Rotman Electrical does not argue otherwise.

fees and costs,[49] except for:  (1) $244,988.56 of the $375,359.22
amount because the Funds did not provide market support for the
Westinghouse job; and (2) $27,430.66 of the $105,055.10 amount
because of the inaccurate calculation of past due interest.  As
previously noted in footnote 39 and related text, the latter
figure presents a genuine issue of material fact.  Accordingly,
summary judgment in plaintiffs' favor to collect this amount
against Rotman Electrical under counts one or two is not
appropriate.

Liability for the $244,988.56 amount turns upon whether the
Funds properly failed to provide market support or, conversely
stated, improperly charged back the market support and interest
thereon to Rotman Electrical.  Plaintiffs raise two arguments
with respect to the market support charges.  (Docket Entry ## 100
& 111).  The first argument is based on the facts.  As averred by
Gambino, they point out that no ELMCT funds were used to pay any

_____

    [49]  Rotman Electrical's acknowledgment of owing $310,782.59
of the $583,201.81 amount waives the argument that the amount is
not proper.  See Higgins v. New Balance Athletic Shoe, Inc., 194
F.3d 252, 260 (1st Cir. 1999). ("District court is free to
disregard arguments that are not adequately developed"); In re
Pharmaceutical Industry Average Wholsale Price Litigation, 588
F.3d 24, 31 (1st Cir. 2009).  It also constitutes an admission of
fact sufficient on warrant summary judgment on Count One for this
amount.  See Taylor v. Blakey, 490 F.3d 965, 973 (D.C.Cir. 2007)
(noting in parenthetical that "representation in brief may be
treated as admission on file" within meaning of Rule 56(c));
Stallard v. U.S., 12 F.3d 489, 496 n.27 (5th Cir. 1994); United
States v. One Heckler-Koch Rifle, 629 F.2d 1250, 1253 (7th Cir.
1980).

portion of Rotman Electrical's contributions.  They also rely on the fact that Rotman Electrical was not current in its obligations thereby disqualifying it from seeking market support under the procedures required to obtain such support.

Rotman Electrical, in turn, identifies various facts which support its argument that it received market support for the $244,988.56 amount.  These facts include that Rotman Electrical submitted monthly reports throughout the period of the Westinghouse job.  The reports calculate the total amount of contributions but then deducted the contributions for the Westinghouse job and provided a total amount reflecting the deduction.  Rotman Electrical submitted the monthly payroll reports to the Electrical Construction Trust Funds.  At no time during the Westinghouse job did the Administrator or Monahan suggest that the monthly reports with the calculated deductions were not valid or that market support had terminated.  The August 2008 letter from the Funds' counsel only referenced the overdue installment payment under the promissory note.  Subsequent letters were not specific to the amount or the Westinghouse job. (Docket Entry # 93, Ex. 6).  The May 16, 2008 email and Michael Rotman's averment about its context also evidence that "the Fund" approved Rotman Electrical's request for market support for the Westinghouse job.  Consequently, viewing the record in favor of the applicable non-moving party, summary judgment for plaintiffs

to recover these amounts ($244,988.56) or for Rotman Electrical to deduct this amount from the claimed $583,201.81 amount is not appropriate under the facts.

In the second argument, plaintiffs contend that neither the Funds nor EILMCT waived any right with respect to seeking anything but the full amount of contributions owed by Rotman Electrical. Citing Massachusetts case law, plaintiffs correctly point out (Docket Entry # 111) that evidence of a waiver, which is defined as "the voluntary relinquishment of a known right," must be "strong." DSF Investors, LLC v. Lyme Timber Co., 2004 WL 3414427, *12 (Mass.Super. Dec. 22, 2004) (collecting cases).

Accepting the premise that evidence to establish the waiver of a known right must be strong, the facts nonetheless provide sufficient evidence to allow a reasonable finder of fact to find that "the Fund" accepted the request for market support in May 2008 for the Westinghouse job with knowledge of the well known fact that Rotman Electrical was struggling financially. (Docket Entry # 107, ¶¶ 5-8 & Ex. A). Thereafter, as explained in the previous paragraph, throughout the time period of the Westinghouse job Rotman Electrical submitted monthly reports that included the amount of the contributions, deducted the portion applicable for market support and represented the reduced amount as the applicable remittance. The absence of any complaint or charge back of the deduction of the contributions specific to the

Westinghouse job provides additional support to find a waiver. As presented, plaintiffs' arguments do not warrant summary judgment for the market support charges.[50]

That said, the merits of Rotman Electrical's market support claim based on arguments *not* raised by plaintiffs is debatable.[51] Rotman Electrical may not be entitled to a waiver defense with respect to the section 1145 claim in Count One. See Michigan Elec. Employees Pension Fund v. Encompass Elec. & Data, Inc., 556 F.Supp.2d 746, 767 (W.D.Mich. 2008) ("hold[ing] that the defendants may not use the doctrines of waiver and estoppel, or any other state-law defenses to contract formation or enforcement that might otherwise apply, to avoid compliance with its . . . benefit payment obligations under the CBAs that were incorporated into the letters of assent"); Board of Trustees of Local 41 International Brotherhood of Electrical Workers Health Fund v. N.E.R.S., Inc., 2007 WL 4934236, *4 (W.D.N.Y. Oct. 24, 2007) (in enacting section 1145, "Congress intended to limit the defenses available to an employer when sued by an employee benefit plan").

--------

[50] In presenting the arguments, plaintiffs do not distinguish between Rotman Electrical's Section 1145 liability under Count One or its Section 185 liability under Count Two. Any additional, unspecified argument specific to Count Two is waived with respect to seeking summary judgment. See Higgins, 194 F.3d at 260.

[51] Although this court ordinarily does not sua sponte identify weaknesses in a party's claim, this case is more than three years old thus warrating more active involvement.

Furthermore, the collective bargaining agreement does not expressly allow for such market support agreements or render them enforceable against administrators of a fund such as plaintiffs' with respect to the section 1145 claim in Count One.  See Laborers' Pension Fund v. A & C Environmental, Inc., 301 F.3d 768, 778-779 (7th Cir. 2002).

B.  The Rotmans' Liability

Count Three alleges the Rotmans breached the promissory note and the security agreement.  The Rotmans seek summary judgment "for the entry of orders" declaring:  (1) that "[t]he Rotmans' Collateral secures only those obligations that they incurred under the Promissory Note, and no others;"[52]and (2) that "[t]he obligations of the Promissory Note have been legally satisfied by application of cash proceeds received by the Administrator since the commencement of this civil action."  (Docket Entry # 105). Plaintiffs, in turn, contend that the Rotmans breached these agreements by failing to pay the outstanding amount of $99,661.52 and are therefore liable under Count Three.

_____

[52] The Funds do not seek liability against Rotman Electrical for breach of the note and the security agreement.  In other words, they bring Count Three only against the Rotmans. Accordingly, Schedule B assets for breach of the notes can only be used to satisfy the Rotmans' debt under the note and the security agreement.  The Funds do not name Rotman Electrical as liable in Count Three.  In addition, the Funds do not argue that the amount placed in escrow can be reached to satisfy Rotman electrical's liability under ERISA or Section 185 in counts one and two.  Rather, they argue that the terms of the note and the security agreement extend to reach Rotman Electrical's debts.

1.  <u>The Security Agreement and Note as Covering the Debts of</u>
<u>Rotman Electrical</u>

The parties initially disagree about whether the agreements allow the Funds to take the Rotmans' collateral in Schedule B to satisfy the entire debt of Rotman Electrical to the Funds. The Rotmans argue that the plain language of the security agreement, which speaks to the obligations of "the Debtors" as a whole as opposed to the debts of one of the debtors, i.e., Rotman Electrical, prevents the Funds from applying the collateral to the debts of Rotman Electrical. Based on language in the security agreement and the promissory note, plaintiffs disagree.

Neither party raises a choice of law issue. For present purposes, federal common law is the same as Massachusetts state law with respect to contract interpretation. <u>See</u> <u>Ciaramella v.</u> <u>Reader's Digest Association</u>, 131 F.3d 320, 322 (2nd Cir. 1997) (declining to decide question whether New York or federal common law determines whether parties reached settlement of ERISA claims due to absence of any material difference between state law and federal common law). It is therefore not necessary to decide whether the choice of Massachusetts law in the security agreement requires application of Massachusetts law. <u>See</u> <u>generally</u> <u>Buce v.</u> <u>Allianz Life Ins. Co.</u>, 247 F.3d 1133, 1154 (11th Cir. 2001); <u>Cohen v. Independence Blue Cross</u>, 2011 WL 5040706, *6 (D.N.J. Oct. 24, 2011) (choice of law clause may be followed in ERISA

contract).

Where, as here, "several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together." Federal Deposit Insurance Corporation v. Singh, 977 F.2d 18, 21 (1st Cir. 1992) (construing together a guaranty and a promissory note); accord Noonan v. Wonderland Greyhound Park Realty LLC, 723 F.Supp.2d 298, 328 (D.Mass. 2010); see, e.g., Chase Commercial Corporation v. Owen, 588 N.E.2d 705, 707 (Mass.App.Ct. 1992) (construing as part of single transaction a guaranty and two loan and security agreements executed simultaneously and referencing the other agreements). In other words, "Interlocking documents that are part of a single transaction and are interrelated in purpose, must be read together to effectuate the intention of the parties." Matthews v. Planning Board of Brewster, 892 N.E.2d 797, 803 (Mass.App.Ct. 2008) (internal quotation marks and brackets omitted); Noonan v. Wonderland Greyhound Park Realty LLC, 723 F.Supp.2d at 328. Because the security agreement and the promissory note involve the same subject matter, the same parties and cross reference each other, they are read together to effectuate the intent of the parties. See Chase Commercial Corporation v. Owen, 588 N.E.2d at 707.

An agreement is "construed so as to give it effect as a rational business instrument and in a manner which will

effectuate the intent of the parties; the parties' intent must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part." Bukuras v. Mueller Group, LLC, 592 F.3d 255, 262 (1st Cir. 2010) (quotation marks, citations and brackets omitted); accord Shane v. Winter Hill Federal Savings and Loan Association, 492 N.E.2d 92, 94 (Mass. 1986) (contract "construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties"). A contract is also "construed to give a reasonable effect to each of its provisions if possible" and thereby avoid rendering any provision superfluous. State Line Snacks Corp. v. Town of Wilbraham, 555 N.E.2d 892, 894 (Mass.App.Ct. 1990) (emphasis added); see Strand v. Herrick & Smith, 489 N.E.2d 179, 182 (Mass. 1986) (avoiding reading of contract that "render[s] any provision superfluous"); Noonan v. Wonderland Greyhound Park Realty LLC, 723 F.Supp.2d at 327; accord Langone v. USCO Distribution Services, Inc., 389 F.Supp.2d 91, 98 (D.Mass. 2005) (applying same principle in ERISA action based on federal common law).

Words within an agreement are "construed in their ordinary and usual sense," Boston Edison Company v. Federal Energy Regulatory Commission, 856 F.2d 361, 365 (1st Cir. 1988); Shane v. Winter Hill Federal Savings and Loan Association, 492 N.E.2d 92, 95 (Mass. 1986), "unless it appears that [the words] are to

45

be given a peculiar or technical meaning." <u>Woogmaster v.</u>
<u>Liverpool & London & Globe Insurance Company Limited</u>, 45 N.E.2d
394, 395 (Mass. 1945).  In addition, when a term appears more
than once in the agreement, it ordinarily receives the same
meaning.  <u>See</u> <u>Barilaro v. Consolidated Rail Corporation</u>, 876 F.2d
260, 265 n.10 (1st Cir. 1989) (recognizing the "'general rule in
the construction of a written instrument that the same word
occurring more than once is to be given the same meaning unless a
different meaning is demanded by the context'").

Courts also examine the location of words within a sentence
as well as the grammatical signals used, such as commas, to
decipher the meaning intended by the parties.  <u>See</u> <u>Massachusetts</u>
<u>Mutual Life Insurance Company v. Aritech Corporation</u>, 882 F.Supp.
190, 194-195 (D.Mass. 1995).  Both the structure and the specific
words set out an agreement's meaning.  <u>Boston Edison Company v.</u>
<u>Federal Energy Regulatory Commission</u>, 856 F.2d at 366; <u>see</u>, <u>e.g.</u>,
<u>McDonald's Corporation v. Lebow Realty Trust</u>, 888 F.2d 912, 915
(1st Cir. 1989) (noting that fixed price option and right of
first refusal appeared in "separate paragraphs with eight
intervening paragraphs between them").

Contract terms receive their plain meaning and "extrinsic
evidence may not be used to contradict the unambiguous terms of a
contract." <u>Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.</u>,
7 F.3d 1047, 1052 (1st Cir. 1993).  Put another way, "words that

46

are plain and free from ambiguity" are "construed in their usual and ordinary sense." Cady v. Marcella, 729 N.E.2d 1125, 1129-30 (Mass.App.Ct. 2000) (internal quotation marks omitted); see World Species List-Natural Features Registry Institute v. Reading, 913 N.E.2d 925, 930 (Mass.App.Ct. 2009) (construing words that "are plain and free from ambiguity . . . in accordance with their ordinary and usual sense"); accord Langone v. USCO Distribution Services, Inc., 389 F.Supp.2d at 98 (under federal common law, "'contracts containing unambiguous language must be construed according to their plain and natural meaning'").

"'To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties.'" Farmers Insurance Exchange v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) (quoting Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008)). "'A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" Gemini Investors Inc. v. AmeriPark, Inc., 643 F.3d 43, 52 (1st Cir. 2011); see Bukuras v. Mueller Group, LLC, 592 F.3d at 262 (ambiguity arises when language is "'susceptible of more than one meaning so that reasonably intelligent persons would differ as to which meaning is the proper one'"); accord Bank v. Thermo Elemental Inc., 888 N.E.2d

897, 907 (Mass. 2008) (language considered "ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the two words employed and the obligations undertaken'"). Even if "a term is clear by itself," an ambiguity may arise "'when read in the context of the entire contract, or as applied to the subject matter.'" Gemini Investors Inc. v. AmeriPark, Inc., 643 F.3d 43, 52 (internal ellipses and citation omitted).

As noted, the parties dispute whether the Rotmans' obligations and the collateral in Schedule B owned by the Rotmans cover all of Rotman Electrical's corporate debts to the Funds. Plaintiffs rely on the previously quoted clause in the security agreement that states, "The security interest herein granted is to secure payment of principal and interest . . . and any and all indebtedness, liabilities and obligations of the Debtors to Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, secured or unsecured, now existing or hereafter arising." (Docket Entry # 93-5). According to plaintiffs, this language indicates that the collateral in the three schedules secures the continuing obligations of Rotman Electrical as opposed to the joint obligations of the debtors, i.e., Rotman Electrical and the Rotmans. Relying on the meaning of the term "Debtors," the Rotmans disagree.

48

The term "Debtors" is a defined term. The first paragraph of the security agreement defines Rotman Electrical, Michael Rotman and Nancy Rotman as "(hereinafter called 'Debtors')." The security agreement uses the plural "Debtors" throughout the five page agreement. In the first paragraph, the Debtors "grant" the Funds "a security interest in the following property . . . appropriately designated, the Collateral." Captioned "COLLATERAL," the second paragraph defines "collateral" as "the list of" items in the three schedules. (Docket Entry # 93-4). It does not define collateral in terms of which debtor owns which item or piece of collateral in the attached list in each schedule.

Thus far, therefore, the plain and ordinary meaning of the plural term "Debtors" refers to the Rotmans and Rotman Electrical. Captioned "OBLIGATIONS," the third paragraph of the security agreement describes the obligations "of Debtors to Secured Parties," i.e., the Funds. (Docket Entry # 93-4). The language of the first sentence is undeniably broad and, as noted above, plaintiffs rely on it as indicating that the collateral secured the entire debt and future obligations of Rotman Electrical. The complete sentence reads as follows:

> The security interest herein granted is to secure the
> payment of principal and interest as provided in a
> promissory note of Debtors of even date herewith in the
> amount of $401,724.69, with interest from September 2007 to
> present, attorneys fees and costs, *and any and all*
> *indebtedness, liabilities and obligations of Debtors to*

> *Secured Parties,* whether direct or indirect, absolute or
> continent, due *or to become due*, secured or unsecured, now
> existing *or hereafter arising*.

(Docket Entry # 93-4) (emphasis added).

The only then existing indebtedness or obligations of all three (the Rotmans and Rotman Electrical) was the promissory note. The plain meaning of the additional language includes and describes obligations of "Debtors" that will arise in the future. Plaintiffs' argument that "hereinafter arising" "would not make sense" if the promissory note only covered the obligations of the Rotmans and Rotman Electrical, however, is misplaced. The plain language is that these future obligations are "*of Debtors* to Secured Parties." (Docket Entry # 93-5). The language describing future obligations is also not superfluous because it would encompass subsequent promissory notes by the Rotmans and Rotman Electrical such as the one proposed by the Funds in January 2009. Massachusetts law recognizes the validity of dragnet clauses to secure future advances or debts between the same parties. See generally Debral Realty, Inc. v. Marlborough Co-op. Bank, 717 N.E.2d 1023, 1025-1026 (Mass.App.Ct. 1999). Furthermore, the agreement could have described "the obligations" as obligations of Rotman Electrical or the Rotmans. The parties obviously knew how to refer to this entity and these individuals separately as they did so at the outset in the first paragraph. Instead, however, the parties refer to all three as group defined

as "Debtors" and the indebtedness, liabilities and obligations of the "Debtors to the Secured Party," again using the group term "Debtors."

Under the caption "REPRESENTATIONS, WARRANTIES AND COVENANTS," however, the Funds correctly point out (Docket Entry # 111) that "the Debtors" represent they have "good and marketable title to the Collateral," "the Collateral is owned by the Debtors," the "Debtors will not sell . . . the Collateral" and the "Debtors will pay" the taxes "promptly when due." (Docket Entry # 93-4).  Because Rotman Electrical did not own the two accounts in Schedule B and the Rotmans did not have marketable title to Rotman Electrical's vehicles listed in Schedule A and would not pay the taxes on such vehicles, the Funds argue that "Debtors" does not always refer to Rotman Electrical and the Rotmans but must mean one or more of them. (Docket Entry # 111).

In addition, under the paragraph captioned "MISCELLANEOUS PROVISIONS," the security agreement lists six provisions.  One provision states that "all obligations of Debtors hereunder shall bind their, or *its* heirs, administrators, executors, successors and assigns." (Docket Entry # 93-4) (emphasis added).  The plain meaning of the word "its" in this context refers to Rotman Electrical.

In sum, the language and structure of the security agreement

create a question as to whether the debt includes all of Rotman Electrical's obligations to the Funds and whether the Rotmans' collateral covers such debt. The promissory note clarifies the parties' intent as to the meaning.

Turning to the language of the promissory note, the first sentence of the first paragraph sets out the amount "[t]he Makers" (defined as the Rotmans and Rotman Electrical) "promise to pay" the Funds. It states that the Makers "promise to pay the sum of FOUR HUNDRED AND ONE THOUSAND SEVEN HUNDRED TWENTY FOUR DOLLARS AND SIXTY NINE CENTS ($401,724.69)" to the Funds. (Docket Entry # 93-5). The paragraph then identifies the installment payment dates and the payment amounts, which again add up to $401,724.69 "plus interest from September 2007 and attorneys['] fees and costs from June 2007." (Docket Entry # 93-5). Specifically, the Makers promised "to pay *this sum*" to the Funds "in the following installments:

| Date Due: | Amount Due: |
|-----------|-------------|
| 3/6/2008 | $100,000 |
| 4/1/2008 | $50,000 |
| 5/1/2008 | $50,000 |
| 6/1/2008 | $50,000 |
| 7/1/2008 | $50,000 |
| 8/1/2008 | $50,000 |
| 9/1/2008 | $50,000 |
| 10/1/2008 | $1,742.69, plus interest from September 2007 and attorneys['] fees and costs from June 2007 |

(Docket Entry # 93-5) (emphasis added).

The next paragraph repeats that the final installment "shall

include the full amount of interest from September 2007 and attorneys['] fees and costs . . . from June 2007." (Docket Entry # 93-5). Prior to any reference to liquidated damages,[53] the paragraph states that, "The Makers may pay *the full amount due* to the Funds at any time." (Docket Entry # 93-5) (emphasis added). The full amount thus refers to the previous amount set out twice in the first paragraph by numbers and by words and then by a list of the installment payments "plus interest from September 2007 and attorney['] fees and costs from June 2007."

This next paragraph also sets out the condition allowing the Funds to collect "the entire amount owed" if Rotman Electrical falls behind in its current obligations to the Funds. Like the aforementioned "full amount," the "entire amount owed" set out twice in the first paragraph and again with the list of the installment payments. Specifically, it reads, "*If* Rotman Electrical Co., Inc. falls behind in its *current obligations* to the Funds, the Funds will proceed to collect *the entire amount*

_____

[53] Plaintiffs rely on the two references to liquidated damages that appear in this paragraph and the next paragraph to argue that the collateral secured all of Rotman Electrical's corporate debt to the Funds. They point out that liquidated damages "would only fall due at a future date, and would never be due from the individual defendants but only from the corporation." (Docket Entry # 111). They reason that, "the Promissory Note specifically provides that the Schedule B investment accounts would be used to pay the future debt of Rotman Electrical only – that is, liquidated damages" and it is therefore "unmistakably clear from the words of the Note that the Schedule B investment accounts were to be taken to pay for future Rotman Electrical debts." (Docket Entry # 111).

*owed* to the Funds,[54] including interest, liquidated damages,
attorney's fees and costs of collection, from the assets listed
in Schedules A, B and C."  (Docket Entry # 93-4) (emphasis
added).  The failure of Rotman Electrical to pay current
obligations is a condition precedent[55] that allows the Funds to
collect "the entire amount owed to the Funds, including interest,
liquidated damages, attorney's fees and costs of collection."
(Docket Entry # 93-5).  The commas separating "including
interest" followed by the list of damages identify damages in the

_____

[54] The only "entire amount owed" identified in the document
is the above, repeatedly defined amount of $401,724.69 "plus
interest from September 2007 and attorneys['] fees and costs from
June 2007."  The prior clause in the sentence sets out the
condition for Rotman Electrical to keep its obligations current.
Contrary to plaintiffs' argument (Docket Entry # 111), the fact
that the Funds could collect "the entire amount owed" from the
list of assets in the schedule, some of which the Rotmans owned
and others of which Rotman Electrical owned, does not define the
obligations or the debt of "the Debtors," which is the specific
amount set out in the promissory note.

[55] Under Massachusetts law, it is generally, albeit not
absolutely, necessary to use emphatic words to create a condition
precedent.  Massachusetts Municipal Wholesale Electric Company v.
Town of Danvers, 577 N.E.2d 283, 288 (Mass. 1991) ("'[e]mphatic
words' are generally considered necessary to create a condition
precedent that will limit or forfeit rights under an agreement").
Examples of such emphatic words include the word "if" used by the
parties in the promissory note.  See Massachusetts Port Authority
v. Johnson Controls, Inc., 766 N.E.2d 542, 544 (Mass.App.Ct.
2002) ("if the parties intended that the giving of notice was a
condition precedent to trigger the indemnification provision,
they could easily have drafted contract language to so provide,
through the use of words such as . . . 'if'"); see also
Massachusetts Municipal Wholesale Electric Company v. Town of
Danvers, 577 N.E.2d at 288 (citing Restatement (Second) of
Contracts § 226, comment a (1981)).

event the condition occurs.  The inclusion of liquidated damages

is a measure of damages as opposed to a description of the debt

or the collateral securing that debt.  Thus, even accepting the

fact that the reference is to the statutory liquidated damages

imposed under section 1132(g)(2)(C)against Rotman Electrical

because no other liquidated damages provision would apply (except

as to the DIF which again would be imposed against the employer,

Rotman Electrical), such damages do not define the debt, the

debtors or the reach of the collateral to Rotman Electrical's

corporate debt.

Simply put, "liquidated *damages*" defines damages, i.e., the

amount of money the Makers will owe the Funds in the event the

condition precedent occurs.  The words "liquidated damages" do

not, as argued by the Funds, expand the definition of "Debtors"

to mean only Rotman Electrical at times.  Indeed, such a

construction also goes against the tenet that the same term in an

agreement retains the same meaning throughout the agreement.  See

Barilaro v. Consolidated Rail Corporation, 876 F.2d at 265 n.10.

The next paragraph has a similar structure.  It sets out a

condition ("payment of $400,000 not . . . received on or before

October 1, 2008") which, if it occurs, allows the Funds to "take

the assets listed in the attached Schedules A, B, and C to

satisfy the full amount of the remaining debt, with additional

interest, liquidated damages, and attorneys['] fees and costs as

they accrue." (Docket Entry # 93-5). Again, liquidated damages refers to the amount of money owed to the Funds in the event the condition occurs.

It is undisputed that the Funds did not receive "payment of $400,000 . . . on or before October 1, 2008."[56] (Docket Entry # 93-5). It is also undisputed that Rotman Electrical fell "behind in its current obligations to the Funds." (Docket Entry # 93-5). As a result of the occurrence of these two conditions, "the entire amount owed to the Funds" or "the full amount of the remaining debt" to the Funds became due. (Docket Entry # 93-5). As explained, both amounts refer to the $401,724.69 sum "plus interest from September 2007 and attorneys['] fees and costs from June 2007." (Docket Entry # 93-5). The first of the two paragraphs allows the Funds "to collect the entire amount owed to the Funds, including interest, liquidated damages, attorney's fees and costs of collection, from the assets listed in Schedules A, B, and C." (Docket Entry # 93-5). Likewise, the second of the two paragraphs allow the Funds to "take the assets in the attached Schedules A, B, and C to satisfy the full amount of the remaining debt, with additional interest, liquidated damages, and attorney['].s fees and costs." (Docket Entry # 93-5). Accordingly, the Funds may "collect" or "take" the assets in the

_____

[56] The final $50,000 installment was paid on November 24, 2008. (Docket Entry # 101-1).

56

schedules to satisfy the remaining principal of the $401,724,69 ($26,742.69) and to satisfy the additional interest, the liquidated damages and the attorney's fees and costs.[57] (Docket Entry # 93-5).

Contrary to the Funds' position, however, the language and structure of the security agreement and the promissory note read together as interlocking documents do not evidence the parties' intent to allow the Funds to collect the entirety of Rotman Electrical's debt to the Funds from the assets listed in Schedules A, B and C. The documents unambiguously do not allow the Funds to use the assets to collect Rotman Electrical's corporate debt as opposed to the debt of all three "Debtors." Rather, they allow the Funds to use these assets to satisfy and collect the remaining principal ($26,724.69) along with interest, liquidated damages, attorney's fees and costs.

Even assuming dubitante that an ambiguity exists, the extrinsic evidence points to only one conclusion. See McAdams v. Massachusetts Mutual Life Insurance Co., 391 F.3d 287, 299 n.6 (1st Cir. 2004) ("judges interpret even ambiguous contracts involving disputed extrinsic evidence where the

---

[57] The materially disputed fact of whether there was an agreement to provide market support for the Westinghouse job yields different calculations for the interest and the section 1132(g) calculation of liquidated damages which depends upon the amount of "interest on unpaid contributions." 29 U.S.C. § 1132(g).

evidence is so one-sided that no reasonable finder of fact could decide for the alternative interpretation"); Nadherny v. Roseland Property Company, Inc., 390 F.3d 44, 49 (1st Cir. 2004) (even if "extrinsic evidence is considered, a judge may conclude that the evidence is 'so one-sided that no reasonable person could decide the contrary'"); Bank v. International Business Machines, Corporation, 145 F.3d 420, 424 (1st Cir. 1998) (summary judgment proper only where extrinsic evidence "is so one-sided that no reasonable person could decide to the contrary").[58] Extrinsic evidence includes the parties' negotiations and "their post-contract conduct." Jensen v. Jensen, 2011 WL 2174898, *6 (D.Mass. June 3, 2011).

Here, the only extrinsic evidence identified by the parties to resolve the ambiguity, if any, is: (1) the course of conduct in proposing the new promissory note and the new security agreement in January 2009; and (2) the drafting of the March 2008 promissory note and the security agreement by the Funds' counsel.[59] With respect to the latter argument, the Rotmans

_____

[58] Ordinarily, once an ambiguity arises it is an issue of fact for the jury to resolve. See Gemini Investors Inc. v. AmeriPark, Inc., 643 F.3d 43, 51 (1st Cir. 2011).

[59] This court declines to explore any other extrinsic evidence because the parties do not identify such evidence as bearing upon the ambiguity issue. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[i]t is not enough merely to mention a possible

point out that Michael Rotman signed the promissory note and the security agreement without counsel and the Funds' counsel drafted both documents.

The Rotmans correctly point out that if a writing is ambiguous, the ambiguity is construed against the drafter. <u>See</u> <u>Merrimack Valley Nat. Bank v. Baird</u>, 363 N.E.2d 688, 690 (Mass. 1977); <u>see also</u> <u>Hubert v. Melrose-Wakefield Hospital Association</u>, 661 N.E.2d 1347, 1351 (Mass.App.Ct. 1996) (rule of construing ambiguity against drafter gives way to primary rule of interpreting contracts to ascertain true intent of parties); <u>see also</u> <u>Restatement (Second) Contracts</u> § 206 (1981) ("[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words"). This cannon of construction however "has little to do with actual intentions and should only be used, as a last resort, if other aids to construction leave the case in equipoise." <u>National Tax Institute, Inc. v. Topnotch at Stowe Resort and Spa</u>, 388 F.3d 15, 18 (1st Cir. 2004). The strength of the cannon's application is also "open to doubt" when "the contract is between two sophisticated parties." <u>Fenoglio v. Augat, Inc.</u>, 254 F.3d 368, 372 n.3 (1st Cir. 2001).

---

argument in the most skeletal way, leaving the court to do counsel's work").

The Funds point to the deposition testimony of Michael Rotman as evidencing his sophistication. (Docket Entry # 101-3). This testimony shows that Michael Rotman became the owner of Rotman Electrical in or around 2006 or 2007. He started working at the company in or around 1980 after finishing two years of college and became the company's president in or around 2000. He has a master's license and a journeyman's electrical license. In negotiating the promissory note and the security agreement, Michael Rotman did not pledge certain real estate that the Funds sought as collateral. (Docket Entry # 101-3, pp. 8-15 & 84-88). Because of his level of sophistication, this court gives little if any weight to the fact that the Funds' counsel drafted the promissory note and the security agreement.

Turning to the only other extrinsic evidence identified by the parties as bearing on the ambiguity with respect to the reach of the pledged collateral, the Rotmans contend that the new promissory note and the new security agreement show that the collateral pledged in the March 2008 note and security agreement did not cover the current obligations of unpaid contributions of Rotman Electrical. They aptly point out there would be no need to re-pledge the assets, including the two investment accounts in Schedule B, to cover the obligations of Rotman Electrical if, as plaintiffs argue, the March 2008 promissory note and security agreement already covered and secured the future debts of only

Rotman Electrical.

When construing an ambiguity, such post contract conduct provides evidence of the parties' intent. Indeed, often "'[t]here is no surer way to find out what parties meant, than to see what they have done.'" Browning-Ferris Industries, Inc. v. Casella Waste Management of Massachusetts, Inc., 945 N.E.2d 964, 972 (Mass.App.Ct. 2011) (quoting Martino v. First National Bank, 280 N.E.2d 174 (Mass. 1972)); accord TLT Construction Corp. v. RI, Inc., 484 F.3d 130, 136 (1st Cir. 2007) ("'[t]here is no surer way to find out what parties meant, than to see what they have done'"); Martino v. First National Bank of Boston, 280 N.E.2d 174, 179 (Mass. 1972) ("'no surer way to find out what parties meant, than to see what they have done'"); Pittsfield & N.A.R. Corp. v. Boston & A.R. Co., 157 N.E. 611, 614 (1927) (same).

Here, the Funds' post contract conduct of seeking new agreements pledging the same collateral in Schedule B but covering an additional $375,000 is telling. By the end of December 2008, Rotman Electrical's unpaid contributions for the July through December 2008 period totaled $375,359.22, according to Gambino. (Docket Entry # 101-1, ¶ 6). Gambino also attests to additional monies owed by Rotman Electrical for interest on the foregoing unpaid contributions ($66,121.25) and interest on late paid contributions ($105,055.10). (Docket Entry # 101-1, ¶

6). With the principal on the March 2008 note reduced to $26,742.69, the Funds' counsel sought the new promissory note under which the Rotmans would promise to pay $375,000, an amount that roughly equaled the corporate debt of Rotman Electrical for unpaid contributions incurred after the March 2008 agreements.

The Funds' counsel also sought the new security agreement pledging the same assets in Schedule B. There would be no need to obtain a new security agreement with the same assets in Schedule B if those assets already covered the corporate debt of Rotman Electrical for the July to December 2008 unpaid contributions. With neither party proffering other extrinsic evidence to support their interpretation of the ambiguity, if any, the extrinsic evidence points to only one conclusion, i.e., the parties intended that the pledged assets in the schedules would not reach future obligations incurred solely by Rotman Electrical.

The issue therefore reduces to determining the undisputed amount owed by the Rotmans under the promissory note and the security agreement applying the foregoing construction. Turning to the amount owed, plaintiffs seek summary judgment against the Rotmans in the amount of $99,661.52. This amount consists of: (1) the unpaid balance of the promissory note ($26,742.69), which the Rotmans do not dispute; (2) the unpaid interest on late paid contributions from September 2007 through January 2008

($52,430.66), which the Rotmans dispute insofar as it exceeds $25,000; and (3) attorneys' fees and costs ($20,488.17), an amount the Rotmans do not address in any detail.

As to item two, the promissory note unequivocally requires the Rotmans to include "the full amount of interest from September 2007" in the final installment payment due on October 1, 2008. It is undisputed that the Rotmans did not pay this amount (Docket Entry # 101-1, ¶ 12; Docket Entry # 101, ¶ 17) and therefore breached the agreement. It is also undisputed that the Funds did not receive the $400,000 amount on or before October 1, 2008. Rather, they received only $375,000. Hence, they failed to comply with this material condition thereby breaching the agreement.

Gambino attests that the amount of "[p]ast-due interest on late-paid contributions due under the Note, from September 2007 through January 2008" is $52,430.66. (Docket Entry # 101-1, ¶ 14). In contrast, Michael Rotman avers that his reconstruction of the amount results in the approximate sum of $25,000. (Docket Entry # 107, ¶¶ 20-21). Hence and as previously stated, the amount above and beyond the $25,000 figure presents a genuine issue of material fact.

As to the third item, the foregoing breaches of the promissory note also entitle the Funds to damages in the amount set forth in the note. Damages under the note include

63

"attorneys['] fees and costs as they accrue" or "attorney's fees and costs of collection." The note does not impose a reasonableness requirement. By affidavit, plaintiffs set out the amount of the fees including all of the billing entries. They seek to recover the actual amount of attorney's fees and costs they incurred and the note allows for such damages. From the Rotmans, plaintiffs request the legal fees and costs the Funds incurred between June 2007 and January 25, 2009 ($9,205.58) and half of the legal fees and costs incurred between January 26, 2009 to July 2011 excluding all work on the mechanic's lien cases ($22,565.19 ÷ 2 = $11,282.60). Under the terms of the note, the Rotmans therefore owe attorney's fees and costs to the Funds in the amount of $20,488.18 ($9,205 + $11,282.60).

In short, the Rotmans owed the undisputed amount of $72,230.87 ($26,742.69 + $25,000 + $20,488.18). Next, they seek to reduce this amount by the $110,044.10 amount paid by Albany Associates LLC and Westinghouse to the Funds in the settlement agreement. The Funds did not apply this amount to the oldest debt. Instead, the Funds applied the amount by allocating it to the union employees who worked on the Albany or Westinghouse jobsite. (Docket Entry # 112, ¶ 6). On prior occasions between March and December 2008, Michael Rotman spoke to the Funds' counsel concerning the application of payments he made on behalf of Rotman Electrical. At all times, counsel indicated she would

apply the payments "to the oldest outstanding obligations to the Administrator first." (Docket Entry # 104, ¶ 15).  Because counsel did apply these payments consistently to the oldest outstanding obligation, the Rotmans argue that this practice coupled with the provisions of section 9-608 of the Massachusetts Uniform Commercial Code[60] require the Funds to reduce the amount owed under the note by the $110,044.10 settlement proceeds.

Federal common law applies to the interpretation of the

---

[60] The security agreement states that the Funds "*may exercise and shall have the* rights and *remedies* of a Secured Party under the Uniform Commercial Code in effect in Massachusetts." (Docket Entry # 93-4) (emphasis added).  This discretionary language does not require the Funds to engage those remedies or bind the Funds to adhere to them.  Section 9-608 creates an order of application of cash proceeds received by a secured party.  The statute reads as follows:

Application of Proceeds of Collection or Enforcement; Liability for Deficiency and Right to Surplus.

(a) Application of proceeds, surplus, and deficiency if obligation secured.  If a security interest or agricultural lien secures payment or performance of an obligation, the following rules apply:

(1) A secured party shall apply or pay over for application the cash proceeds of collection or enforcement under Section 9-607 in the following order to:

(A) The reasonable expenses of collection and enforcement and, to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses incurred by the secured party;

(B) the satisfaction of obligations secured by the security interest or agricultural lien under which the collection or enforcement is made . . ..

Mass. Gen. L. ch. 106, § 9-608.

settlement agreement inasmuch as it involved the release or
settlement of contribution payments and other ERISA
liabilities.[61]  See Morais v. Central Beverage Corp. Union
Employees' Supplemental Retirement Plan, 167 F.3d 709, 711 (1st
Cir. 1999) (court erred in applying state law to "Settlement
Agreement releasing Morais' ERISA-based claims" which is governed
by federal common law principles of contract interpretation).
Having previously discussed these rules, this court turns to
their application.

First and foremost, the language of the settlement agreement
states that the payments made by Albany Associates LLC and
Westinghouse "shall be back charged" against Hamilton
Construction Management Corporation ("Hamilton"), the company
that completed Rotman Electrical's work on the Albany and
Westinghouse projects.  (Docket Entry # 107, Ex. J).  The
language then states that Hamilton "shall back charge Rotman
[Electrical]" and that "Rotman [Electrical] agrees to the back
charge." (Docket Entry # 107).  In addition, one of the whereas
paragraphs notes that Hamilton denies "that any funds are due or
will ever become due Rotman [Electrical] due to Rotman
[Electrical's] actions . . . and cessation of work on the Albany
Project and Westinghouse Project." (Docket Entry # 107).

---

        [61]  The settlement agreement also expressly refers to the
collective bargaining agreement.

66

Second, the settlement proceeds are not obligations of "Debtors" under the terms of the note. The obligations arose after the note. The obligations are those of Rotman Electrical and not the "Debtors." As previously explained, the note covers the amount due of $401,724.69 plus interest from September 2007 and attorneys' fees and costs from June 2007. It does not cover Rotman Electrical's late paid or unpaid contributions for a project that took place after the parties entered into the March 2008 promissory note and security agreement. The course of performance of the Funds' counsel under the note, therefore, does not extend to the application of proceeds received for obligations that the note does not cover. The Funds therefore had little if any obligation to apply the proceeds to the Rotmans' debts under the note.

Third, as aptly and more fully explained by plaintiffs (Docket Entry # 111, pp. 15-18), the context of the settlement agreement involves considering the fiduciary duties of Fund Administrators to participants such as the electrical workers who performed the work at the Albany and Westinghouse jobsites. Indeed, the whereas paragraphs repeatedly refer to the Funds acting "on their own behalf and on behalf of the Funds' participants," i.e., a group that includes the union electrical workers on the Albany and Westinghouse jobsites.

Finally, it is true that the security agreement states that

the Funds "*may exercise and shall have the* rights and *remedies* of
a Secured Party under the Uniform Commercial Code in effect in
Massachusetts." (Docket Entry # 93-4) (emphasis added). This
discretionary language, e.g., "may," however does not require the
Funds to engage those remedies or bind the Funds to adhere to
them.

Accordingly, the Rotmans are not entitled to summary
judgment applying the settlement proceeds ($110,044.10) to
extinguish the remaining amount the Rotmans owe under the note.
Under the terms of the note and the security agreement, the Funds
may use the assets in Schedule B to satisfy the undisputed amount
($72,230.87) that the Rotmans owe under the note. The monies in
escrow may be used to satisfy the balance of this undisputed
amount that the Rotmans owe under the note.

The Funds do not proffer any argument to pierce the
corporate veil of Rotman Electrical. The Rotmans' liability
therefore does not extend the terms of the promissory note under
which they owe the Funds $72,230.87.

CONCLUSION

In accordance with the foregoing discussion, this court
**RECOMMENDS**[62] that Rotman Electrical's cross motion for partial

---

[62] Any objections to this Report and Recommendation must be
filed with the Clerk of Court within 14 days of receipt of the
Report and Recommendation to which objection is made and the
basis for such objection. See Rule 72(b), Fed. R. Civ. P. Any
party may respond to another party's objections within 14 days

summary judgment (Docket Entry #108) be **DENIED** including the request for "the court to order denial of the chargeback of" market support due to the genuinely disputed issues of material fact regarding such support.  It is further **RECOMMENDED**[63] that plaintiffs' summary judgment (Docket Entry #99) be **ALLOWED** to the extent that plaintiff may receive $310,782.59 from Rotman Electrical and $72,230.87 from the Rotmans and otherwise **DENIED**. Finally, it is **RECOMMENDED**[64] that the Rotmans' cross motion for summary judgment (Docket Entry #105) be allowed insofar as it seeks an order that their collateral secures only the obligations they incurred under the promissory not and otherwise **DENIED**.


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.

[63]    See the previous footnote

[64]    See footnote 62.